**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| ROBERT LENOIS, on behalf of himself and all other similarly situated stockholders of ERIN ENERGY CORPORATION, and derivatively on behalf of ERIN ENERGY CORPORATION,<br><br>        Plaintiff,<br><br>    v.<br><br>KASE LUKMAN LAWAL, LEE P. BROWN, WILLIAM J. CAMPBELL, J. KENT FRIEDMAN, JOHN HOFMEISTER, IRA WAYNE McCONNELL, HAZEL R. O'LEARY, and CAMAC ENERGY HOLDINGS, LIMITED,<br><br>        Defendants,<br><br>   and<br><br>ERIN ENERGY CORPORATION,<br><br>        Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 11963-VCMR |

**MEMORANDUM OPINION**

Date Submitted:  July 21, 2017
Date Decided:  November 7, 2017

Stuart M. Grant and Michael J. Barry, GRANT & EISENHOFER P.A., Wilmington, Delaware;  Peter B. Andrews and Craig J. Springer, ANDREWS & SPRINGER LLC, Wilmington, Delaware;  Jeremy Friedman, Spencer Oster, and David Tejtel, FRIEDMAN OSTER & TEJTEL PLLC, New York, New York;  *Attorneys for Plaintiff.*

1

Myron T. Steele, Arthur L. Dent, and Jaclyn C. Levy, POTTER ANDERSON & CORROON LLP; David T. Moran and Christopher R. Bankler, JACKSON WALKER L.L.P., Dallas, Texas; *Attorneys for Defendants Kase Lukman Lawal and CAMAC Energy Holdings, Limited.*

Gregory V. Varallo, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; J. Wiley George, ANDREWS KURTH LLP, Houston, Texas; *Attorneys for Defendants John Hofmeister, Ira Wayne McConnell, and Hazel R. O'Leary.*

David J. Teklits and Kevin M. Coen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Mark Oakes and Ryan Meltzer, NORTON ROSE FULBRIGHT US LLP, Austin, Texas; John Byron, NORTON ROSE FULBRIGHT US LLP, Houston, Texas; *Attorneys for Defendants Lee P. Brown, William J. Campbell, J. Kent Friedman and Nominal Defendant Erin Energy Corporation.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This case arises out of transactions between an oil and gas exploration company (Erin Energy Corporation, "Erin" or the "Company"), its controller (Kase Lukman Lawal),[1] a controller-affiliated company (Allied Energy Plc, "Allied"), and a third-party entity (Public Investment Corporation Limited, "PIC"). In the transactions at issue, PIC invested in Erin, and Erin transferred stock to PIC. Erin then transferred to Allied the majority of the PIC cash, a convertible subordinated note, Erin stock, and a promise of certain future payments related to the development of a new oil discovery, in exchange for certain Allied oil mining rights. The other stockholders in the Company also received additional shares in connection with the transactions (the "Transactions").

One individual—Lawal—initiated the process and acted simultaneously as (1) a controller of Erin, (2) a controller of and the sole negotiator for Allied, which was counterparty to Erin, and (3) the effective sole negotiator between Erin and the other counterparty in the transaction, PIC. Thus, the remaining board members relied on the controller as the sole voice for—and, more importantly, information source from—the two entities, Allied and PIC, despite a potential misalignment of incentives for the controller. And the complaint is replete with allegations of bad faith conduct against Lawal, including that he attempted to dominate the process,

---

[1]     After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended.

withheld material information from the board, and rushed the board into the unfair Transactions.

Yet at the same time, the Erin board formed an independent committee to manage the process. That committee retained reputable, independent legal and financial advisors, resisted attempts to rush the process, pushed back on numerous deal terms, and obtained materially better terms, including an infusion of much-needed cash into the troubled Company. Thereafter, a majority of the minority of stockholders approved the issuance of shares required for the Transactions.

Plaintiff brings derivative breach of fiduciary duty claims against the controllers for presenting and the board of directors for approving the purportedly unfair Transactions, in which the Company allegedly overpaid for the Allied assets by between $86.2 million and $198.8 million. Plaintiff also asserts direct breach of fiduciary duty claims against the board regarding the alleged disclosure violations in the transaction proxy, and against Lawal for aiding and abetting the breach of the duty of disclosure.

Plaintiff did not make demand on the board under Court of Chancery Rule 23.1 before filing this action. Instead, Plaintiff argues that he has alleged sufficient facts to raise a reason to doubt that the decision to enter into the Transactions was a product of a valid exercise of business judgment. Plaintiff claims that the board acted in bad faith by allowing Lawal to hijack the process and pressure the Company

4

into a bad deal, making demand futile under the second prong of *Aronson*.[2] And even if this behavior does not amount to bad faith, Plaintiff alleges that demand is futile because one person—Lawal—acted in bad faith and, alternatively, because the board was inadequately informed and breached its duty of care.

Defendants move to dismiss the derivative claims for failure to make demand pursuant to Rule 23.1. Defendants argue that demand is not excused as futile because the directors, other than Lawal, are independent and disinterested and the Transactions were a valid exercise of business judgment. Defendants contend that in assessing demand futility, the Court must look to the whole board's culpability, and in this case, Plaintiff fails to plead non-exculpated claims as to a majority of the board in light of Erin's exculpatory charter provision. Defendants also move to dismiss the direct disclosure claims under Court of Chancery Rule 12(b)(6), arguing that the alleged damages from the disclosure claims flow to the Company and, thus, must be dismissed.

In this opinion, I follow what I believe to be the weight of authority in Delaware. I hold that where directors are protected by an exculpatory charter provision adopted pursuant to 8 *Del. C.* § 102(b)(7), a plaintiff must allege that a majority of the board faces a substantial likelihood of liability for non-exculpated

---

2     *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984).

5

claims in order to raise a reason to doubt that the challenged decision was a valid exercise of business judgment under the second prong of *Aronson*.[3] Applying that law in the instant case, I hold that demand is not excused as futile because Plaintiff fails to plead non-exculpated claims against Erin's director defendants (other than Lawal). Further, Plaintiff's direct disclosure claims fail because the alleged injury is to the Company.

Thus, I grant the Motion to Dismiss the action.

## I. BACKGROUND

All facts derive from the Verified Class Action and Derivative Complaint (the "Complaint"), Plaintiff's Verified Supplement to the Verified Class Action and Derivative Complaint (the "Supplement"), and the documents incorporated by reference therein.[4]

### A. Parties and Relevant Non-Parties

Plaintiff Robert Lenois is a stockholder of Nominal Defendant Erin. Erin, previously CAMAC Energy, Inc., is a Delaware corporation principally located in

---

[3]     *Id.* at 815 (citations omitted) (explaining that demand may be excused as futile "in rare cases [where] a transaction . . . [is] so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists").

[4]     On a motion to dismiss, the Court may consider documents outside the pleadings if "(1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents." *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013).

6

Houston, Texas. Erin engages in oil and gas exploration with a focus on sub-Saharan Africa.

Defendant Lawal is the Chairman and Chief Executive Officer of Erin. As of April 1, 2015, Lawal also owned 27.7%, and other members of his family owned 69.3%, of non-party CAMAC International Limited, which indirectly owns 100% of defendant CAMAC Energy Holdings Limited ("CEHL"). CEHL is a Cayman Islands limited liability company headquartered in Houston, Texas and is a holding company for businesses in global oil and gas exploration and production. Lawal and CEHL are the controlling stockholders of Erin. Before the Transactions at issue, Lawal and CEHL owned 58.86% of the Company's outstanding shares. CEHL also has wholly-owned subsidiaries including non-parties Allied and CAMAC International (Nigeria) Limited ("Camac International"). Allied is a Nigerian registered company that specializes in the upstream oil and gas business. Non-party PIC is a South African quasi-public pension fund manager.

Defendants Lee Patrick Brown, William J. Campbell, J. Kent Friedman, John Hofmeister, Ira Wayne McConnell, and Hazel R. O'Leary are members of the Erin board ("Director Defendants," and collectively with Lawal, the "Board"). Defendants O'Leary, McConnell, and Hofmeister served on the special committee that considered the relevant Transactions (the "Special Committee").

7

## B. Facts

CEHL began oil operations in sub-Saharan Africa in the early 1990s. The Nigerian government awarded Oil Mining Leases 120 and 121 (the "Oil Mining Leases") for twenty year terms to Allied and Camac International in 2002. Oyo Field, located off the coast of Nigeria, is included in these Oil Mining Leases. In 2005, Allied and Camac International conveyed a 40% interest in the Oil Mining Leases to Nigerian AGIP Exploration Limited ("NAE"), and the three entities entered into a production sharing contract governing their relationship with the Oil Mining Leases (the "Production Sharing Contract").[5]

In 2010, Erin (then known as Pacific Asia Petroleum, Inc.) acquired a portion of Allied's and Camac International's rights in the Production Sharing Contract relating to the Oyo Field in exchange for giving CEHL $32 million, 62.7% ownership in Erin, and an agreement to pay an additional $6.84 million within six months of the consummation of the transaction (the "2010 Acquisition"). CEHL also gave Erin a right of first refusal for a period of five years as to any licenses, leases, or other contract rights for exploration or production of oil or gas owned by CEHL. After the 2010 Acquisition, the Erin board was expanded from five members

---

[5]     Compl. ¶¶ 21-23.

to seven members, and CEHL nominated four new directors, including Lawal, who was appointed non-executive Chairman.[6]

In February 2011, Erin purchased all of Allied's and Camac International's Production Sharing Contract rights not related to Oyo Field. In June 2012, Allied entered into a contract to purchase the remainder of NAE's interests in the Oil Mining Leases and the Production Sharing Contract in exchange for $250 million of cash consideration plus certain adjustments, leaving Allied and Erin as the only owners of the Oil Mining Leases and the only entities subject to the Production Sharing Contract.[7]

### 1. Lawal negotiates with PIC and the Board forms the Special Committee

In January 2013, Allied, through Lawal, proposed to Erin a transaction in which Erin would re-domicile as an English company listed on the London Stock Exchange, raise funds through a public offering of newly issued shares, and acquire the remaining interests in Oyo Field from Allied. Erin formed a special committee consisting of Hofmeister, Campbell, and Friedman to consider this offer. In April

---

[6]     *Id.* ¶¶ 26-28.

[7]     *Id.* ¶¶ 30-31.

2013, this committee was disbanded because Allied began exploring a transaction with PIC and a third party.[8]

In June 2013, PIC and Lawal, on behalf of Allied, negotiated a transaction in which PIC would invest $300 million in Erin for a 30% ownership interest in Erin, and Erin would transfer all of the money, along with additional Erin stock, to Allied in exchange for Allied's remaining Oil Mining Lease interests. Director Defendants were not aware of these negotiations. On June 14, 2013, Allied and PIC presented the proposed transactions to the Board.[9]

On June 17, 2013, the Board formed the Special Committee to consider the proposal. The Special Committee included Hofmeister, the former President of Shell Oil, as Chairman, O'Leary, the former United States Secretary of Energy, and McConnell, the managing partner of a Texas-based accounting firm. The Special Committee first convened on June 26, 2013 and retained Andrews Kurth LLP ("Andrews Kurth") as its legal advisor and Canaccord Genuity Limited ("Canaccord") as its financial advisor. At a subsequent meeting on June 28, the Special Committee decided to meet with and rely on the guidance of the Company's Chief Financial Officer Earl McNeil and General Counsel Nicholas Evanoff.[10]

---

[8]     *Id.* ¶¶ 32-34.

[9]     *Id.* ¶¶ 35-36.

[10]    *Id.* ¶¶ 37-39.

On July 8, 2013, The Special Committee met to discuss a timeline of the proposed transactions that they had received from Allied. At the meeting,

> [Hofmeister] expressed his concern that certain steps noted for previous times in the draft timeline had seemingly been completed without the Special Committee's review and comment, even though the Special Committee is the party that should be responsible for making these decisions and driving the transaction. He also expressed his concern that the draft timeline should have been labeled as work product of Allied.[11]

At the same July 8 meeting, the Special Committee asked McNeil to prepare an outline of material terms to be negotiated with Allied and the most favorable possible outcome for Erin on each term.

### 2. The Special Committee begins negotiations

At the July 12, 2013 Special Committee meeting, Evanoff "requested that the Special Committee allow him to send a draft agreement to Allied 'in order to meet Allied's timing expectations and maintain a working relationship with Allied,'"[12] and the Special Committee agreed. Also at that meeting, McNeil purportedly gave a summary of management's analysis of the material terms for the draft agreement (the "Transfer Agreement"). This included McNeil's explanation that "the

---

[11] *Id.* ¶ 40.

[12] *Id.* ¶ 42.

ownership interests and split" in the Oil Mining Leases were very complicated.[13] McNeil also allegedly "distributed a valuation exercise that he had prepared regarding the proposed transaction."[14] On July 19, the Special Committee met again and considered revisions to the draft Transfer Agreement with McNeil and Evanoff. But at a July 26, 2013 Special Committee meeting, O'Leary expressed her "concern that the Committee still did not have enough information on the working capital and capital expenditure requirements that could be expected with regard to the Company's future operation of Oil Mining Lease 120/121."[15]

On August 5, 2013, the Special Committee met to discuss the proposed transactions and the "problems that Nigerian oil operators were experiencing with respect to theft of production."[16] On August 6, Allied sent Evanoff its markup of the draft Transfer Agreement, and the Special Committee met in mid-August to discuss Allied's proposed changes.

On August 13, 2013, the Company filed its Form 10-Q for the six months ended June 30, 2013.

> [I]t disclosed that although it had a net working capital
> deficit of $12 million, including cash and cash equivalents

---

[13]   *Id.* ¶ 43.

[14]   *Id.* ¶ 44.

[15]   *Id.* ¶ 46.

[16]   *Id.* ¶ 47.

of $2 million, management believed that the Company would have sufficient capital resources to meet projected cash flow requirements for the next twelve months, assuming no additional participation in Oyo Field operating and development costs through such date. Although the Company's consolidated financial statements were prepared assuming the Company would continue as a going concern, it was necessary for the Company to describe in the Form 10-Q certain factors that could raise substantial doubt about the Company's long-term financial viability.[17]

On August 30, 2013, the Special Committee met with McNeil and Andrews Kurth to discuss the draft technical report of Gaffney, Cline & Associates, an independent reserve engineer hired by the Special Committee. McNeil represented that Canaccord also had received a copy, and that he and Canaccord were incorporating the results into their valuation analyses. Canaccord's financial analysis addressed the "future capital and operational expenditures" for the Oil Mining Leases,[18] topics on which O'Leary noted at the July 26, 2013 meeting that "the Committee . . . did not have enough information."[19] The Special Committee did not meet in September 2013; however, "Allied, Lawal, and certain Company executives worked extensively on the proposed transaction," and "Lawal continued

---

[17] Special Comm. Opening Br. Ex. A, at 25.

[18] *Id.* at 26.

[19] Compl. ¶ 92.

13

to communicate with . . . PIC regarding their potential investment in the Company."[20]

### 3. The Special Committee feels pressure to finalize the deal

On October 9, 2013, PIC sent Erin a commitment letter (the "Commitment Letter") outlining its proposal to invest $270 million in Erin in exchange for 30% ownership of the Company's stock after Erin completed the proposed transaction with Allied. This was based on a $900 million valuation of the total assets the Company would hold after the Allied transaction. Lawal informed Evanoff that the investment was conditioned on PIC's ability to nominate a director to the board if it retained more than 20% ownership of Erin. Evanoff and the Company's outside counsel, Sidley Austin LLP ("Sidley Austin"), drafted a revised share purchase agreement, and on October 11, Evanoff sent this draft to PIC (the "Share Purchase Agreement") without the Special Committee's knowledge or approval.

The Special Committee met again on October 14, 2013 to discuss the Commitment Letter. O'Leary expressed "concern over the fact that the Committee was not able to deal directly with PIC."[21] McNeil also presented the Special Committee with his valuation framework for evaluating and negotiating the transaction and his view of the Company's possible strategic alternatives.

---

[20]     *Id.* ¶ 49.

[21]     *Id.* ¶ 54.

14

On October 17, 2013, Canaccord presented an "early draft" of its analyses to the Special Committee. The Special Committee then told McNeil to "seek a formal proposal from Allied and to draft a list of the issues and elements of a potential transaction."[22] Allied sent a revised proposal on October 21. Under this proposal, Allied would transfer its remaining interests in the Oil Mining Leases and the Production Sharing Contract in exchange for $270 million in cash and enough Erin shares such that Allied and CEHL would own 63.6% (the "October 21 Proposal"). PIC also gave the Company an executed copy of the Share Purchase Agreement listing the exact number of shares to be issued to PIC: 376,884,422.

The Board met on October 21, 2013, and Lawal purportedly told the Board that "if a deal could not be reached between the Special Committee and Allied in the near term, then . . . PIC might abandon its commitment to make the $270 million investment in the Company."[23] This allegedly was backgrounded by the "substantial doubt about the Company's ability to continue as a going concern" without the investment from PIC.[24]

The Special Committee met on October 24, 2013 to consider the October 21 Proposal. At the meeting, Hofmeister purportedly "expressed his concern that the

---

[22]    *Id.* ¶ 56.

[23]    *Id.* ¶ 59.

[24]    *Id.*

audited financial statements for Oil Mining Leases 120/121 had not been received by the Committee, and that part of the evaluation of the Proposed Transaction would revolve around the Committee and its advisors' ability to perform diligence on the assets to be acquired."[25]  In response, a representative from Canaccord noted that while the Special Committee "would need audited financial information for diligence purposes, . . . the valuation would hinge on the future prospects of the Company, not the historical results."[26]  The Canaccord representative further "explained that as a practical matter, audited financials would have to be delivered in connection with the Company's proposed listing on the Johannesburg Stock Exchange."[27]

On October 25, 2013, the Special Committee met again to craft a counterproposal to Allied and PIC (the "October 25 Counterproposal").  The Special Committee decided that the Company should keep $100 million of the cash proceeds from the PIC investment and offer Allied $170 million in cash and a number of shares that would leave Allied and CEHL as owners of 58.6% of Erin's stock.  The Special Committee also decided to make a counterproposal to PIC via Lawal.  In exchange for the $270 million investment, the Special Committee would provide

---

[25]     *Id.* ¶ 60.

[26]     Special Comm. Opening Br. Ex. D, at 2.

[27]     *Id.*

16

176,473,091 shares of Company stock to PIC.  At that same meeting, the Special Committee expressed concerns that it had not engaged directly with PIC about the investment, decided it would need to contact Lawal about "the background of his contacts with . . . PIC," and "questioned whether an introduction to . . . PIC was desirable or feasible."[28]  Hofmeister purportedly had a telephone conversation with Lawal later that day to discuss the October 25 Counterproposal.[29]  Hofmeister also requested that Lawal meet with members of the Special Committee to "discuss the background and status of PIC's investment."[30]

The following day, on October 26, 2013, Hofmeister and Lawal discussed the number of Erin shares to be issued to PIC.  Lawal purportedly "threatened Hofmeister that any change in the number of shares provided to . . . PIC could jeopardize the potential transaction."[31]  On October 28, Lawal met with the Special Committee and expressed his negative view of the proposed reduction in cash consideration paid to Allied, the pro forma ownership of Allied/CEHL, and the number of shares to be issued to PIC.  Lawal also reiterated that PIC might abandon the $270 million investment if an agreement could not be reached in the "near

---

[28]     Compl. ¶ 63.

[29]     *Id.* ¶ 64.

[30]     *Id.*

[31]     *Id.* ¶ 65.

17

term."[32]    Subsequently, the Special Committee withdrew its October 25 Counterproposal.

On October 28 and 29, 2013, Lawal, Evanoff, and McNeil met with Allied to discuss the terms of a revised offer. Lawal stated in an email to the Special Committee that a "PIC representative had expressed concern that the Share Purchase Agreement had not yet been executed, and suggested that . . . PIC would surely withdraw its offer if the Share Purchase Agreement were not executed by October 31, 2013."[33] Lawal informed McNeil and Evanoff of the deadline and expressed his view that PIC might withdraw if the Special Committee attempted to negotiate the number of shares to be issued by Erin.

On October 29, 2013, Allied provided the Special Committee with a revised offer, in which Erin would pay Allied $270 million and issue enough shares to bring Allied and CEHL's ownership to 61.25%. Simultaneously, PIC would invest $270 million in exchange for 30% of the outstanding equity of Erin (376,884,422 shares).

The Special Committee met on October 30, 2013 to discuss the Allied proposal. At the meeting,

> the [Special] Committee considered that Dr. Lawal had not proceeded in a manner consistent with the goals of the Committee when he promised PIC a fixed number of

---

[32]    *Id.* ¶ 66.

[33]    *Id.* ¶ 68.

18

shares and collected PIC's signature page to the SPA. The Committee also considered that Dr. Lawal had been continually pressuring the Committee to speed up its process in evaluating the Proposed Transaction. Ms. O'Leary noted the board meeting that was convened on October 21, 2013, in which the Committee defended the speed at which it was proceeding despite the urgings of Dr. Lawal and certain other members of the board to come to a decision more quickly. The Committee also considered that it did not fully understand why the SPA needed to be executed by October 31, 2013, and questioned the immediacy on which Dr. Lawal had insisted. During executive session, the Committee members expressed their concerns regarding the Committee's lack of information relating to the issuance of shares to . . . PIC. Mr. McConnell expressed his concern that this made it very difficult for the Committee to make informed decisions relating to the Proposed Transaction.[34]

Lawal and the Special Committee met on October 31, 2013, and Lawal echoed his earlier statements that PIC would rescind its offer if Erin did not respond by 10:00 a.m. the next day, November 1. Immediately following that meeting, the Special Committee discussed a term sheet, which included a fixed number of shares, 376,884,422, to be issued to PIC, conditioned on (1) a satisfactory financial evaluation from Canaccord and (2) negotiation of documentation. The Special Committee also discussed retaining a portion of PIC's cash investment by structuring the payment to Allied as a subordinated note, rather than cash. McNeil "advised that such a subordinated note issued to Allied would allow the Company

---

[34]    *Id.* ¶ 70 (quoting Special Committee minutes from the October 30, 2013 meeting).

19

to retain funds for liquidity purposes and should not interfere with the Company's future ability to raise additional liquidity through a senior notes offering."[35]

After the October 31, 2013 meeting, the Special Committee sent a counterproposal to Allied (the "October 31 Counterproposal"), conditioned on receiving a fairness opinion from Canaccord, with the following terms: (1) a $270 million cash investment by PIC in Erin in return for 376,884,422 shares; (2) $170 million cash paid to Allied; (3) a $100 million convertible subordinated note from Erin to Allied for a five-year term with an interest rate of the one month LIBOR plus 1% and a conversion rate equal to PIC's investment price per share; (4) issuance of 622,835,270 shares of Erin stock to Allied, making Allied and CEHL own a combined 61.25%, with other stockholders owning 8.75%; (5) a stock dividend to current Erin stockholders, paid prior to any issuances, to achieve post-closing ownership percentages of PIC at 30%, Allied/CEHL at 61.25%, and other stockholders at 8.75%; (6) Allied funding the drilling costs of the Oyo-7 well and Erin bearing the completion costs; and (7) an extension and expansion of the existing 2010 right of first refusal agreement with Allied to include "corporate opportunities" without reference to a term or expiration date.[36]

---

[35] *Id.* ¶ 73.

[36] *Id.* ¶ 74.

On November 1, 2013, the Board held a special meeting. Lawal updated the Board on the status of negotiations with PIC, and Hofmeister summarized the status of the Special Committee's negotiations. On November 6, the Special Committee met with Evanoff, McNeil, Andrews Kurth, and Sidley Austin to discuss the status of the negotiations and documentation. McNeil represented that Canaccord was "continuing with its financial analysis and would soon be seeking the guidance of its fairness opinion committee."[37]

### 4. Canaccord gives its fairness opinion and Allied gives its "best and final" offer

On November 13, 2013, the Company filed its Form 10-Q for the nine months ended September 30, 2013.

> [I]t disclosed that its net working capital deficit had increased from $12 million to $13 million, and cash and cash equivalents had declined to $435,000. As a result, management no longer believed that the Company would have sufficient capital resources to meet projected cash flow requirements for the next twelve months, and the Company stated there was substantial doubt about the Company's ability to continue as a going concern.[38]

On November 13, 2013, Canaccord told the Special Committee that it could not conclude the October 31 Counterproposal terms were fair. Out of a range of scenarios examined by Canaccord, the "base case" scenario valued Allied's net

---

[37] *Id.* ¶ 76.

[38] Special Comm. Opening Br. Ex. A, at 35.

21

economic interest in the Oyo Field at $217.3 million. Canaccord calculated that the "base case" value of the proposed consideration was $647 million under a "market value" analysis and $425.6 million under a discounted cash flow analysis. Thus, the October 31 Counterproposal represented a 96% to 198% premium. Canaccord also performed an accretion/dilution analysis and determined that the transactions would be 65.23% accretive to Allied/CEHL but 14.97% dilutive to Erin's public stockholders.

On November 14 and 15, 2013, Hofmeister and Lawal discussed potential changes to the deal structure, such as Allied relinquishing the $100 million note to Erin or reducing the post-closing Allied/CEHL ownership from above 61% to 51%. Lawal then counterproposed the following to Hofmeister: Allied would reduce the convertible subordinated note to $50 million and accept a reduced share issuance such that it would result in a 56.97% post-closing ownership in the Company; ownership of other stockholders would increase to a total of 13.03% post-transaction. Plaintiff contends that at the end of these discussions, "Lawal strong-armed Hofmeister by threatening that any pushback or further negotiations that would enhance the deal conditions for the Company would be rejected by Allied, and Lawal stated that these terms represented Allied's 'best and final' offer."[39]

---

[39] Compl. ¶ 84.

The final material terms after the discussion (the "Final Proposal") were as follows: (1) $270 million in cash invested in Erin by PIC to acquire 376,885,422 shares; (2) $170 million in cash consideration paid by Erin to Allied; (3) a $50 million convertible subordinated note from Erin to Allied with a five-year term and an interest rate of LIBOR +5% and a conversion price equal to PIC's investment price per share; (4) issuance of 497,454,857 shares of Erin stock such that Allied and CEHL would collectively own 56.97%, and the other stockholders would own 13.03%; (5) a stock dividend of 255,077,157 shares of Erin stock to existing stockholders paid prior to the new issuances to achieve post-closing ownership of 30% for PIC, 56.97% for Allied/CEHL, and 13.03% for other stockholders; (6) Allied funding the drilling costs of the Oyo-7 well, and Erin bearing costs of completion; and (7) the termination of existing Non-Oyo Contract Rights in exchange for Erin's agreement to make two payments of $25 million to Allied.[40] Regarding the two $25 million payments in exchange for the termination of the Non-Oyo Contract Rights,

> the Company [would] pay $25 million to Allied after approval of a development plan for a new discovery in the Oil Mining Leases outside of the Oyo Field and $25 million after commencement of production from such new discovery, with Allied having the right to elect to receive each of the $25 million payments in cash or in shares of the Company's common stock with an equivalent value

---

[40]     *Id.* ¶ 85.

instead of in cash, but with payment in stock being mandated if a cash payment by the Company would materially adversely affect its working capital position or its ability to carry out its capital or then established regular cash dividend programs.[41]

On November 18, 2013, Canaccord gave the Special Committee their presentation on the Final Proposal and determined it was fair to Erin and its stockholders. Based on this information, on November 18, the Special Committee approved the terms and recommended the Transactions to the Board, and in turn, the Board approved the Transactions and recommended that the stockholders approve as well. On November 20, the parties issued a press release announcing the terms and disclosing the transaction-related documents.

### 5. Erin stockholders approve the stock issuances required for the Transactions

On January 15, 2014, Erin filed the transaction proxy with the SEC (the "Proxy"). On February 13, 2014, Erin held a special meeting of the stockholders to vote on certain proposals, including the approval of (1) the Transfer Agreement, (2) the Share Purchase Agreement, and (3) an amendment to the Company charter to increase the number of outstanding shares of common stock for use as consideration. The stockholders approved the proposals, with approximately 64% of the total

---

[41]    *Id.*

outstanding minority shares and 99.5% of the voted shares cast in approval. The Transactions closed about a week later.

### 6. A non-party's disclosures reveal Allied only paid $100 million of the $250 million contract price to acquire the Oil Mining Leases

In 2012, Allied acquired the Oil Mining Leases in the current challenged Transactions from Nigerian AGIP Exploration Limited, whose parent company is Eni S.p.A. ("Eni"), a multinational oil and gas company. In the minutes of Eni's 2016 annual meeting, Eni revealed that while the sale price in that contract was $250 million—which would have become $304 million after various accounting adjustments—"[o]nly $100 million of the total consideration . . . has been paid. The remainder is the subject of recovery by means of a legal action."[42] Plaintiff has been unable to confirm, and Defendants do not identify, "the existence of any legal action relating to the rest of the purported $250 million purchase price."[43]

### C. Procedural History

On February 5, 2016, Lenois filed the Complaint. Defendants moved to dismiss the Complaint on March 3, 2016. Thereafter, the parties briefed motions to dismiss, and the Court held oral argument on January 18, 2017.

---

[42]    Supplement Ex. B, at 191.

[43]    Pl.'s Opp'n Br. to Mot. to Dismiss Supplement 15 n.20.

25

On April 17, 2017, following the release of the minutes from the 2016 Eni Annual Shareholder Meeting, Plaintiff filed a Motion to Supplement the Complaint on the alleged underpayment issue. Defendants opposed, and on May 23, 2017, I granted Plaintiff leave to supplement the Complaint. On June 7, 2017, Defendants moved to dismiss the Supplement. The parties fully briefed the supplemented motions to dismiss on July 21, 2017.

## II. ANALYSIS

Plaintiff brings this action derivatively on behalf of Erin to redress alleged breaches of fiduciary duty in connection with the approval of the purportedly unfair Transactions. Plaintiff also seeks to recover directly for alleged disclosure violations. Defendants move to dismiss under Court of Chancery Rule 23.1 for failure to make pre-suit demand on the board and Court of Chancery Rule 12(b)(6) for failure to state a claim.

### A. Demand Futility Standard

Under 8 *Del. C.* § 141(a), "directors, rather than shareholders, manage the business and affairs of the corporation."[44] This "managerial decision making power . . . encompasses decisions whether to initiate, or refrain from entering, litigation."[45]

---

[44] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).

[45] *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981) (citation omitted); *see also Levine v. Smith*, 591 A.2d 194, 200 (Del. 1991); *Spiegel v. Buntrock*, 571 A.2d 767, 772-73 (Del. 1990); *Aronson*, 473 A.2d at 811-12.

In order for a stockholder to divest the directors of their authority to control the litigation asset and bring a derivative action on behalf of the corporation, the stockholder must allege with particularity either that (1) she has made a demand on the company or (2) her demand would be futile.[46] The demand requirement is a threshold inquiry that "insure[s] that a stockholder exhausts his intracorporate remedies,"[47] "provide[s] a safeguard against strike suits,"[48] and "assure[s] that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation and to control any litigation which does occur."[49]

The Supreme Court of Delaware articulated the tests for demand futility in two seminal cases. Under *Rales v. Blasband*,[50] a derivative plaintiff must allege particularized facts raising a reasonable doubt that "the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[51] To successfully plead demand futility under *Aronson v. Lewis*, a plaintiff must allege particularized facts sufficient to raise a reasonable

---

[46]    Ct. Ch. R. 23.1(a); *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988).

[47]    *Aronson*, 473 A.2d at 811.

[48]    *Id.* at 812.

[49]    *Kaplan*, 540 A.2d at 730 (citing *Aronson*, 473 A.2d at 811-12).

[50]    634 A.2d 927, 934 (Del. 1993).

[51]    *Id.*

doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[52] *Aronson* applies when the plaintiff challenges an action taken by the board that would consider demand.[53] Fundamentally, *Aronson* and *Rales* both "address the same question of whether the board can exercise its business judgment on the corporate behalf" in considering demand.[54] The "[d]emand futility analysis is conducted on a claim-by-claim basis."[55] The Court must accept Plaintiff's particularized allegations of fact as true and draw all reasonable inferences that logically flow from such allegations in Plaintiff's favor.[56]

Plaintiff and Defendants agree that this case falls under the second prong of *Aronson*.[57] The second prong of *Aronson* fulfills "two important integrity-assuring

---

[52]     473 A.2d at 814.

[53]     *Rales*, 634 A.2d at 933-34.

[54]     *In re Duke Energy Corp. Deriv. Litig.*, 2016 WL 4543788, at *14 (Del. Ch. Aug. 31, 2016); *see also In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *16 (Del. Ch. May 21, 2013) (explaining the *Aronson* and *Rales* tests are "complementary versions of the same inquiry"); *Kandell v. Niv*, 2017 WL 4334149, at *11 (Del. Ch. Sept. 29, 2017) (same).

[55]     *Beam v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2003).

[56]     *White v. Panic*, 783 A.2d 543, 549 (Del. 2001).

[57]     Erin Opening Br. 11; Pl.'s Opp'n Br. 27.

28

functions."[58] First, it "addresses concerns regarding the inherent 'structural bias' of corporate boards" and allows suits to continue "even over a putatively independent board's objection if the plaintiff can meet a heightened pleading standard that provides confidence that there is a substantial basis for the suit."[59] Second, it "responds to the related concern that a derivative suit demand asks directors . . . to take an act against their personal interests" and "balances the conflicting policy interests at stake by articulating a safety valve" that allows suit to go forward where the pleading alleges with particularity that "the threat of liability to the directors required to act on the demand is sufficiently substantial to cast a reasonable doubt over their impartiality."[60]

Under the second prong of *Aronson*, the "plaintiff[] must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision."[61] In order to raise a reason to doubt good faith, "the plaintiff

---

[58]      *Guttman v. Huang*, 823 A.2d 492, 500 (Del. Ch. 2003).

[59]      *Id.* (citing *Aronson*, 473 A.2d at 815 n.8).

[60]      *Id.* (citing *Aronson*, 473 A.2d at 815; *Ash v. McCall*, 2000 WL 1370341, at *10 (Del. Ch. Sept. 15, 2000); *Kohls v. Duthie*, 791 A.2d 772, 782 (Del. Ch. 2000)).

[61]      *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 824 (Del. Ch. 2005) ("*J.P. Morgan I*") (quoting *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003) ("*Disney I*")).

29

must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests"[62] and was "essentially inexplicable on any ground other than bad faith."[63] This requires a pleading of "particularized facts that demonstrate that the directors acted with scienter; i.e., there was an 'intentional dereliction of duty' or a 'conscious disregard' for their responsibilities."[64] This is a high burden, requiring an "extreme set of facts."[65] The most salient examples include (1) "where the fiduciary intentionally breaks the law"; (2) "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation"; or (3) "where the fiduciary intentionally fails to act in the face of a known duty to act."[66] While "aspirational goals of ideal corporate governance practices" may be "highly desirable," to the

---

[62] *White*, 783 A.2d at 554 n.36.

[63] *In re BJ's Wholesale Club, Inc. S'holder Litig.*, 2013 WL 396202, at *7 (Del. Ch. Jan. 31, 2013) (quoting *In re Alloy, Inc. S'holder Litig.*, 2011 WL 4863716, at *7 (Del. Ch. Oct. 13, 2011)).

[64] *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *12 (Del. Ch. Oct. 12, 2011) (quoting *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005) ("*Disney II*")).

[65] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (quoting *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 654 (Del. Ch. 2008)).

[66] *In re Goldman Sachs*, 2011 WL 4826104, at *12 (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006) ("*Disney III*")).

extent they "go beyond the minimal legal requirements of the corporation law," they "do not define standards of liability."[67]

There is another, perhaps less onerous, method to prove demand futility under the second prong of *Aronson*. "Pre-suit demand will be excused in a derivative suit only if the . . . particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decisionmaking process, *measured by concepts of gross negligence,* included consideration of all material information reasonably available."[68] "The business judgment rule, however, only requires the board to *reasonably* inform itself; it does not require perfection or the consideration of every conceivable alternative."[69] In the context of a motion to dismiss under Rule 23.1, where a board has relied on an expert opinion,

> the complaint must allege particularized facts (not conclusions) that, if proved would show, for example, that: (a) the directors did not in fact rely on the expert; (b) their reliance was not in good faith; (c) they did not reasonably believe that the expert's advice was within the expert's professional competence; (d) the expert was not selected with reasonable care by or on behalf of the corporation, and the faulty selection process was attributable to the directors; (e) the subject matter (in this case the cost

---

[67]     *Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000) (citing *Lewis v. Vogelstein*, 699 A.2d 327, 338 (Del. Ch. 1997); E. Norman Veasey, *An Economic Rationale for Judicial Decisionmaking in Corporate Law*, 53 Bus.Law. 681, 699-700 (1998)).

[68]     *In re Goldman Sachs*, 2011 WL 4826104, at *15 (alteration in original) (quoting *Brehm*, 746 A.2d at 259).

[69]     *Id.* at *16.

calculation) that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice; or (f) that the decision of the Board was so unconscionable as to constitute waste or fraud.[70]

The question then becomes how the second prong of *Aronson*, which analyzes both care and loyalty issues, interacts with a charter provision that exculpates directors from breaches of the duty of care. The parties disagree on the nature of the interaction. Defendants contend that the existence of an exculpatory charter provision requires Plaintiff to plead particularized facts raising a reasonable doubt that a majority of the board acted honestly and in good faith in order to survive a motion to dismiss for failure to make demand. Plaintiff counters that demand is also futile under the second prong of *Aronson*, despite the existence of an exculpatory charter provision, where the Complaint creates a reason to doubt that any individual director acted in good faith[71] or the board met its duty of care as measured by concepts of gross negligence.[72] Regardless, Plaintiff argues that he has pled particularized facts showing that demand is futile under all three scenarios.

---

[70] *Cal. Pub. Empls. Ret. Sys. v. Coulter*, 2002 WL 31888343, at \*12 (Del. Ch. Dec. 18, 2002) (quoting *Brehm*, 746 A.2d at 262). This Court does not consider "substantive due care" in this context. *Brehm*, 746 A.2d at 264. "Due care in the decisionmaking context is *process* due care only. Irrationality is the outer limit of the business judgment rule." *Id.* (internal citations omitted).

[71] Pl.'s Opp'n Br. 28.

[72] Pl.'s Opp'n Br. to Mot. to Dismiss Supplement 22.

The disagreement between the parties stems from three lines of case law, which I discuss below.

### 1. Single director bad faith actions

Plaintiff argues that he may show demand futility under the second prong of *Aronson* by asserting "particularized allegations that create a reason to doubt that a company director honored his or her duty of loyalty to the company."[73] Plaintiff primarily relies on a transcript decision in *In re Barnes & Noble*[74] to support this theory. *Barnes & Noble* concerned the acquisition of Barnes & Noble College by Barnes & Noble.[75] In a colloquy with counsel regarding whether demand futility under the second prong of *Aronson* requires a showing that a *majority* of the directors who would consider the demand face a substantial likelihood of liability, then-Vice Chancellor Strine said that "if you state that's a breach of fiduciary duty and you have a nonexculpated claim against someone, it goes forward."[76] To hold otherwise would create "a safe harbor for people like [the director in question], where it may

---

[73]   Pl.'s Opp'n Br. 28 (citation omitted).

[74]   *In re Barnes & Noble S'holder Deriv. Litig.*, C.A. No. 4813-VCS (Del. Ch. Oct. 21, 2010) (TRANSCRIPT).

[75]   *Id.* at 5:2-4.

[76]   *Id*. at 35:13-15.

be, for example, that directors are exculpated because they only screwed up in terms of their duty of care."[77] Then-Vice Chancellor Strine added:

> But that if—that the second prong only has teeth if you have a claim against a majority of the board that is pled with particularity and that is nonexculpated. It doesn't seem like much of a safety valve, because how does it act as a safety valve? It's basically a reduplication of the same analysis with this overlay that, frankly, if they can't be held liable—a majority can't be held liable—the fact that someone else could, in particular the interested party, that doesn't matter. They just sue him.[78]

But this Court did not rule demand was futile on this basis. Instead, after a lengthy back-and-forth with the attorneys at the hearing over the culpability of the individual directors in that case, then-Vice Chancellor Strine declined to dismiss the case under the first prong of *Aronson* because the complaint sufficiently pled a reason to doubt that five of the seven board members were disinterested or independent.[79]

Nonetheless, Plaintiff points to the colloquy between counsel and then-Vice Chancellor Strine as support for the proposition that demand is futile under the

---

[77]     *Id.* at 36:12-15.

[78]     *Id.* at 38:8-18.

[79]     *Id.* at 155:14-156:23. In that case, then-Vice Chancellor Strine also voiced, "I don't want this cited back to me that Strine held that you're necessarily not an independent director." *Id.* at 157:22-24.

second prong of *Aronson* if there is a non-exculpated claim against at least one director.

### 2. Duty of care violations of the board

Plaintiff also argues that "a lack of adequate information excuses demand under *Aronson's* second prong" even where an exculpatory charter provision exists.[80] Plaintiff cites to *McPadden v. Sidhu*,[81] which concerned the sale of a subsidiary to a company of a former officer who was not a director.[82] In *McPadden*, the plaintiff alleged that the directors caused the company to sell its wholly-owned subsidiary to members of the subsidiary's management for a fraction of the subsidiary's fair market value.[83] The parties agreed that the question of demand futility should be considered under the second prong of *Aronson*.[84] Despite the existence of an exculpatory charter provision, this Court found that demand was futile because "plaintiff ha[d] pleaded a duty of care violation with particularity

---

[80]    Pl.'s Opp'n Br. to Mot. to Dismiss Supplement 21.

[81]    964 A.2d 1262 (Del. Ch. 2008).

[82]    *Id.* at 1263.

[83]    *Id.* at 1263-64.

[84]    *Id.* at 1270.

sufficient to create a reasonable doubt that the transaction at issue was the product of a valid exercise of business judgment."[85] Specifically, this Court held:

> [T]he board ha[d] no shortage of information that was both material—because it affected the process and ultimate result of the sale—and reasonably available (or, even, actually known as evidenced by the discussions at the board meetings): Dubreville's interest in leading a management buyout of [the subsidiary]; Dubreville's limited efforts in soliciting offers for [the subsidiary], including his failure to contact . . . competitors, including one he knew had previously expressed concrete interest in purchasing [the subsidiary]; the circumstances under which the January and February projections were produced; the use of those projections in [the] preliminary valuations of [the subsidiary]; and that [the management group] was a group led by Dubreville. That the board would want to consider this information seems, to me, so obvious that it is equally obvious that the Director Defendants' failure to do so was grossly negligent.[86]

Having concluded that the directors' actions were grossly negligent, this Court determined that demand was futile under the second prong of *Aronson*.[87] This Court then dismissed the claims as to the directors under Rule 12(b)(6) because they were protected from claims of gross negligence by the company's exculpatory charter provision, but it allowed the case to continue only as to the officer.[88]

---

[85]    *Id.*

[86]    *Id.* at 1272-73.

[87]    *Id.* at 1273.

[88]    *Id.* at 1274-75. Some cases do not address the effects of an exculpatory charter provision when analyzing the second prong of *Aronson*. In *In re Citigroup*

36

This case law suggests that demand is futile under the second prong of *Aronson* if the directors breached their fiduciary duty of either care or loyalty, even where an exculpatory charter provision exists. In a separate step, the Court will then conduct a Rule 12(b)(6) analysis to determine which claims survive, dismissing those that do not.

### 3. Non-exculpated bad faith violations by the board

To end the demand futility analysis under the second prong of *Aronson* with the authority briefed by Plaintiff ignores the many cases cited by Defendants that support a different inquiry. Defendants argue that demand is futile under the second prong of *Aronson* where plaintiff alleges non-exculpated claims against a majority of the board members who would consider the demand. Defendants' briefing cites numerous cases for this proposition, but it relies heavily on two: *Guttman v. Huang*[89] and *Teamsters Union 25 Health Services & Insurance Plan v. Baiera*.[90]

---

*Shareholder Derivative Litigation*, for instance, this Court discussed the effects of an exculpatory charter provision on the claims analyzed under *Rales*, but dealt with the claim analyzed under the second prong of *Aronson* without reference to whether the board faced a substantial likelihood of liability for non-exculpated claims. 964 A.2d 106, 136 (Del. Ch. 2009); s*ee also MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *16-17 (Del. Ch. May 5, 2010); *Ash v. McCall*, 2000 WL 1370341, at *7-10 (Del. Ch. Sept. 15, 2000).

[89]   823 A.2d 492 (Del. Ch. 2003).

[90]   119 A.3d 44 (Del. Ch. 2015).

37

*Guttman* concerned derivative claims that board members and certain corporate officers engaged in insider trading and failed to prevent accounting irregularities.[91] The defendants in the case were the seven members of the board of directors and three corporate officers. This Court noted that demand is excused as futile under the second prong of *Aronson* where "the threat of liability to the directors required to act on the demand is sufficiently substantial to cast a reasonable doubt over their impartiality."[92] Although the parties agreed that the *Rales* test should apply to the demand futility analysis, this Court stated:

> [The] singular inquiry [outlined in *Rales*] makes germane all of the concerns relevant to both the first and second prongs of *Aronson*. For example, in a situation when a breach of fiduciary duty suit targets acts of self-dealing committed, for example, by the two key managers of a company who are also on a nine-member board, and the other seven board members are not alleged to have directly participated or even approved the wrongdoing[,] . . . the *Rales* inquiry will concentrate on whether five of the remaining board members can act independently of the two interested manager-directors. This looks like a first prong *Aronson* inquiry. When, however, there are allegations that a majority of the board that must consider a demand acted wrongfully, the *Rales* test sensibly addresses concerns similar to the second prong of *Aronson*. To wit, if the directors face a "substantial likelihood" of personal liability, their ability to consider a

---

[91]     823 A.2d at 493.

[92]     *Id.* at 500.

38

demand impartially is compromised under *Rales*, excusing demand.[93]

This Court added that where an exculpatory charter provision exists, "a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts."[94] Importantly, this Court then determined that it was required to analyze (1) whether a majority of the board lacked independence or was interested in the challenged transaction or (2) "whether the complaint sets forth particularized facts that plead a non-exculpated claim of breach of fiduciary duty against a *majority* of the board, thereby stripping away their first-blush veneer of impartiality."[95] Applying that test, this Court dismissed the complaint under Rule 23.1 for failure to make demand after finding that (1) a majority of directors were independent and disinterested and (2) a majority of directors, who were covered by an exculpatory charter provision, did not face a substantial likelihood of liability for a non-exculpated breach of fiduciary duty.[96]

The plaintiff in *Baiera* sought to pursue derivative claims challenging the fairness of a services agreement between the company and its controlling

---

[93]    *Id.* at 501 (citations omitted).

[94]    *Id.*

[95]    *Id.* at 502.

[96]    *Id.* at 507.

stockholder that was approved by a committee of the board.[97]  The plaintiff argued that demand was "excused as futile under the second prong of *Aronson* because [the agreement] was a conflicted transaction in which [the] controlling stockholder . . . stood on both sides."[98]  This Court held that the second prong of *Aronson* was not automatically "satisfied whenever entire fairness review might be triggered, irrespective of the circumstances triggering such review or the nature of the claims to which such review might apply."[99]  "Regardless of [whether] the applicable test" is *Aronson* or *Rales*, "the demand futility analysis focuses on whether there is a reason to doubt the impartiality of the directors, who hold the authority under 8 *Del. C.* § 141(a) to decide 'whether to initiate, or refrain from entering, litigation.'"[100]  Thus, "neither the presence of a controlling stockholder nor allegations of self-dealing by a controlling stockholder changes the director-based focus of the demand futility inquiry."[101]  This Court noted that the "focus instead, as explained in *Aronson* and repeated in *Beam*, is on whether Plaintiff's allegations raise a reasonable doubt as to the impartiality of a majority of the Demand Board to have considered such a

---

[97]    119 A.3d at 47.

[98]    *Id.* at 65.

[99]    *Id.* at 65 n.121.

[100]   *Id.* at 67 (quoting *Zapata*, 430 A.2d at 782).

[101]   *Id.*

demand."[102]  This Court "conclude[d] that demand [was not] excused . . . because plaintiff . . . failed to raise a reasonable doubt that at least half of the directors . . . could have exercised impartial business judgment in responding to a demand."[103]

Read together, these cases suggest that where an exculpatory charter provision protects the board, demand is futile under the second prong of *Aronson* if the plaintiff pleads a substantial likelihood of liability for non-exculpated claims against a *majority of directors* who would have considered demand.  Other cases from this Court support a similar conclusion:

- In *Higher Education Management Group, Inc. v. Mathews*, this Court noted that the result of the company's exculpatory charter provision was that "there would be no recourse for Plaintiffs and no substantial likelihood of liability if the *Directors Defendants'* only failing was that they had not become fully informed."[104]  The Court dismissed the claims under Rule 23.1, finding that "Plaintiffs' allegations do not

---

[102]   *Id.* at 68.

[103]   *Id.* at 47.  Plaintiff cites to a transcript opinion in *Montgomery v. Erickson Air-Crane, Inc.*, where this Court stated "[b]ecause the transaction involves a controller, entire fairness is the standard.  Demand is futile under the second prong of *Aronson*." C.A. No. 8784-VCL, 72:9-12 (Del. Ch. Apr. 15, 2014) (TRANSCRIPT).  But in *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, that same author noted that in the time since *Montgomery*, "Chancellor Bouchard has trenchantly analyzed *Aronson* and concluded that to find demand excused because entire fairness applies *ab initio* would be inconsistent with how the Delaware Supreme Court approached the transactions between Fink and Meyers that were at issue in that decision.  I agree, but this serves to highlight the tension between *Aronson* and other Delaware doctrines."  2016 WL 301245, at *29 (Del. Ch. Jan. 25, 2016) (citing *Baiera*, 2015 WL 4192107).  Thus, I do not find demand excused simply because the proper standard of review is entire fairness solely due to an interested transaction with a conflicted controller.

[104]   2014 WL 5573325, at *11 n.63 (Del. Ch. Nov. 3, 2014) (emphasis added).

41

support an inference of bad faith conduct *by a majority of the Director Defendants.*"[105]

- In the demand futility analysis in *Pfeiffer v. Leedle,* this Court found "demand . . . excused under the second prong of *Aronson* due to conduct [by the board] that conceivably cannot be exculpated" by a charter provision, because such conduct constituted "breaches of the duty of loyalty."[106]

- In *In re Goldman Sachs*, this Court noted that, in the presence of an exculpatory charter provision, survival of a Rule 23.1 motion requires plaintiff to "plead particularized facts that demonstrate that the *directors* acted with scienter; i.e., there was an 'intentional dereliction of duty' or 'a conscious disregard' for their responsibilities, amounting to bad faith."[107]

- In *In re Lear*, this Court noted that where a company adopted an exculpatory charter provision, "the plaintiffs [must] plead particularized facts supporting an inference that the *directors* committed a breach of the fiduciary duty of loyalty" by "act[ing] in bad faith" to survive a Rule 23.1 motion to dismiss for failure to make demand.[108]

- In *Disney I*, this Court found that demand was futile because at the pleadings stage, the plaintiff had raised sufficient "doubt whether the *board's* actions were taken honestly and in good faith," which would fall outside the protection of the company's exculpatory charter provision.[109]

---

[105] *Id.* at *11 (emphasis added).

[106] 2013 WL 5988416, at *9 (Del. Ch. Nov. 8, 2013).

[107] 2011 WL 4826104, at *12 (emphasis added) (quoting *Disney II*, 907 A.2d at 755).

[108] 967 A.2d at 652 (emphasis added) (citations omitted).

[109] 825 A.2d at 286 (emphasis added).

I am inclined to follow the weight of this authority. The purpose of the demand futility analysis, as I understand it, is to determine whether the board tasked with considering demand could bring its business judgment to bear. The Court removes the demand decision from the board where the complaint pleads facts as to individual directors showing that a majority of them cannot consider demand impartially. As the Supreme Court stated in *Aronson*, demand may be futile under the second prong if "board approval [of the challenged transaction] cannot meet the test of business judgment, *and* a substantial likelihood of director liability *therefore* exists."[110] As expressed, the test is directed at the board's ability to employ its business judgment in light of potential liability; the inquiry does not focus simply on whether a breach has occurred. Thus, I hold that where an exculpatory charter

---

[110] *Aronson*, 473 A.2d at 815 (emphasis added). *See also Mathews*, 2014 WL 5573325, at *10 ("To succeed on the second prong [of *Aronson*], Plaintiffs must show that the challenged transaction did not reflect the exercise of valid business judgment. This type of conduct is limited to the extreme case of directorial failure, such as one of the 'rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability exists.'" (alterations in original) (quoting *Aronson*, 473 A.2d at 815)); *In re Goldman Sachs*, 2011 WL 4826104, at *15 ("Goldman's charter has a 8 *Del. C.* § 102(b)(7) provision, so gross negligence, by itself, is insufficient basis upon which to impose liability [for the demand futility analysis under the second prong of *Aronson*]. The Plaintiffs must allege particularized facts creating a reasonable doubt that the directors acted in good faith."); *Guttman*, 823 A.2d at 500 (noting that for demand to be excused as futile under the "second prong of *Aronson*[,] . . . the threat of liability to the directors required to act on the demand [must be] sufficiently substantial to cast a reasonable doubt over their impartiality.").

provision exists, demand is excused as futile under the second prong of *Aronson* with a showing that a majority of the board faces a substantial likelihood of liability for non-exculpated claims. That a non-exculpated claim may be brought against less than a majority of the board or some other individual at the company, or that the board committed exculpated duty of care violations alone, will not affect the board's right to control a company's litigation.

## B. Plaintiff Fails to Satisfy the Second Prong of *Aronson*

Plaintiff argues that the Complaint alleges particularized facts sufficient to raise a reason to doubt that Director Defendants and the Special Committee acted in good faith in the following five ways: (1) through the Special Committee's acceptance of Lawal's domination of the transaction, (2) through improper reliance on Erin's financial advisors, (3) through the omissions in the Proxy, (4) through the payment allegations in the Supplement, and (5) through a showing that the Transactions constitute waste. Each fails. I conclude that demand is not excused as futile because Plaintiff has not pled with particularity sufficient allegations to create a reasonable doubt that the Board, protected by an exculpatory charter provision, "act[ed] honestly and in good faith to advance corporate interests" when negotiating and approving the Transactions at issue.[111]

---

[111] *Disney I*, 825 A.2d at 291.

### 1. Good faith standard

The Delaware Supreme Court explicated the spectrum of bad faith in *Disney*. The Supreme Court identified "three different categories of fiduciary behavior" that must be considered.[112] The first "involves lack of due care—that is, fiduciary action taken solely by reason of gross negligence and without any malevolent intent."[113] This type of behavior does not constitute bad faith. The second, an "intentional dereliction of duty, a conscious disregard for one's responsibilities," rises to the level of bad faith.[114] The third, "so-called 'subjective bad faith,'" exists on the far end of the spectrum and refers to "fiduciary conduct motivated by an actual intent to do harm."[115] Determining whether Director Defendants' alleged behavior rises to the level of bad faith requires an examination of where on the *Disney* spectrum—gross negligence to intentional dereliction of duty to subjective bad faith—their actions fall.

### 2. Director Defendants' interactions with Lawal during the process do not raise a reason to doubt good faith

Plaintiff has pled with particularity that Lawal acted in bad faith. From an information standpoint, Lawal appeared on all three sides of the transaction: as sole

---

[112] *Disney III*, 906 A.2d at 64.

[113] *Id.*

[114] *Id.* at 66.

[115] *Id.* at 64.

45

point of contact for PIC, as controller of Allied, and as controller of Erin. In practice, his behavior gave rise to a very real appearance that, by seeming to speak for all three counterparties in the transactions,[116] Lawal really was negotiating with himself in shifting around assets for his own benefit. Citing to the minutes of Special Committee meetings, the Complaint sufficiently alleges that Lawal knowingly and purposefully created an information vacuum such that, by the end of the process, Director Defendants lacked information regarding how and why the parties involved were chosen,[117] the timeline and the seeming need for speed for the transaction,[118] the agreements surrounding stock issuances,[119] PIC generally,[120] the credibility of PIC's threat to withdraw,[121] whose interests Lawal represented at each step,[122] and

---

[116]   For instance, Plaintiff alleges that Lawal "promised . . . PIC that exact number of shares" from Erin, appearing to act as a representative of Erin. Compl. ¶ 58. Later, when presented with the Special Committee's counterproposal, "Lawal adversely reacted to several of the terms, including the proposed reduction in (a) the cash consideration payable to Allied, (b) the pro forma ownership of Allied/CEHL, and (c) the number of shares to be issued to . . . PIC." *Id.* ¶ 66. In doing so, Lawal appeared to be acting as a representative to Allied and PIC.

[117]   *Id.* ¶ 35.

[118]   *Id.* ¶ 40

[119]   *Id.* ¶ 58.

[120]   *Id.* ¶ 54.

[121]   *See id.* ¶¶ 65, 66, 68, 72.

[122]   *Id.* ¶¶ 65, 66, 68, 72.

perhaps even the reasons for and implications of the prior payment issue between Allied and Eni.[123] And Lawal himself clearly knew about the incomplete payment for the initial acquisition of the oil field leases, a highly material fact.

But this does not end the story. The question is whether Director Defendants' behavior raises a reason to doubt their honesty and good faith. For the reasons explained below, I find that their conduct answers that question in the negative.

From the inception of the transaction, Lawal tried to place Director Defendants on the back foot by initiating discussions, selecting counterparties, and negotiating the general deal terms and structure between and among Erin, Allied, and PIC "without the Board's knowledge."[124] In response, the Director Defendants established a Special Committee,[125] which hired an investment banker and retained legal counsel.[126] Lawal tried to control the timeline of events for the transaction.[127] The Special Committee recognized the inherent problem[128] and pushed back on the

---

123    Special Comm. Reply Br. to Supplement 1; Erin Reply Br. to Supplement 22.

124    Compl. ¶ 35.

125    *Id.* ¶ 4.

126    *Id.* ¶¶ 5, 38.

127    Allied sent the Special Committee "a timeline of the proposed transaction **that had been created by Allied**." *Id.* ¶ 40.

128    "Special Committee Chairman Hofmeister 'expressed his concern that certain steps noted for previous times in the draft timeline had seemingly been completed without the Special Committee's review and comment, even though the Special Committee

47

timeline and the steps in deliberations at numerous meetings.[129] Lawal, controller of Erin, used Company executives to negotiate with Erin,[130] and the Special Committee relied on these executives at various times during the process. But the Special Committee sought out information directly from Lawal[131] and relied on its external financial and legal advisors. Lawal attempted to set terms with PIC, such as the number of shares promised to PIC.[132] In response, the Special Committee approved a stock dividend to be issued at consummation of the Transactions in order to "achieve the [desired] post-closing ownership percentages" regardless of Lawal's agreement.[133]

---

is the party that should be responsible for making these decisions and driving the transaction.'" *Id.*

[129] *See, e.g.*, *id.* ¶¶ 38-76.

[130] For instance, during negotiations PIC indicated that it wanted "30% of the outstanding stock . . . [and the] right to nominate one director to the Board." *Id.* ¶¶ 50-51. Lawal chose to share this fact only with Evanoff, who "*without the Special Committee's knowledge or approval*[,] . . . submitted [a] revised draft of the Share Purchase Agreement to . . . PIC." *Id.* ¶¶ 51-52. The Special Committee did not learn any of this until five days after PIC's demand and three days after Erin's own general counsel had submitted a revised draft of the Share Purchase Agreement to PIC. *Id.* ¶¶ 52-54.

[131] *Id.* ¶ 64.

[132] *Id.* ¶ 58.

[133] *Id.* ¶ 85.

Plaintiff contends that Lawal attempted to dictate the terms of the deal with Allied by coercive means. The Special Committee resisted, negotiating through counterproposals[134] and pushing back on deal terms.[135] While Lawal's initial proposal left Erin with no cash from the Transactions, the Special Committee obtained $100 million in cash for the cash-strapped Company on the edge of insolvency.[136] Lawal proposed that Erin issue a $100 million convertible note to Allied, which the Special Committee bargained down to a $50 million note plus two payments of $25 million due only upon certain milestones in a new development in the Oil Mining Leases.[137] Moreover, the Special Committee succeeded in reducing the total payment due upon achievement of the milestones from $55 million to $50 million.[138] Lawal proposed that the post-closing minority stockholder stake in Erin be 4.3%; as a result of the Special Committee's bargaining, minority stockholders held 13.03% of the Company after the Transactions.[139] The Special Committee also succeeded in gaining numerous non-financial terms, including a non-waivable

---

[134]   *Id.* ¶ 74.

[135]   *Id.* ¶ 73.

[136]   *Id.* ¶ 85.

[137]   *Id.*

[138]   *Id.*

[139]   *Id.*

majority-of-the-minority approval condition,[140] an extension of the existing right of first refusal agreement with Allied,[141] the ability of the Special Committee or the Board to change its recommendation that stockholders favor the Transactions,[142] and a fiduciary-out provision.[143]

The Complaint alleges that Lawal deprived the Special Committee of important information regarding the Transactions.[144] In response, the Special Committee recognized the information gaps[145] and made a conscious decision to try to plug the holes created by Lawal.[146] Moreover, while Lawal was an important source of information, he was not the only one. For instance, the Company relied

---

[140] Special Comm. Opening Br. Ex. A, at 41.

[141] *Id.*

[142] *Id.*

[143] *Id.*

[144] See Section II.B.2, *infra*, for a detailed discussion of Lawal's bad faith conduct.

[145] Upon realizing that it lacked important information to transact with PIC, the Special Committee "decided that it would need to discuss with Lawal the background of his contacts with . . . PIC and questioned whether an introduction to . . . PIC was desirable or feasible." Compl. ¶ 63.

[146] In order to rectify information gaps surrounding the nature of the PIC investment, the Special Committee held a meeting at which "Lawal briefed . . . [the Special Committee] on the history of his interactions with representatives of PIC." Special Comm. Opening Br. Ex. A, at 33.

on its banker for a fairness opinion. [147] Indeed, reliance on the banker's fairness opinion seems especially weighty in light of the fact that the banker refused to bless the first proposal,[148] showing that obtaining the fairness opinion was not merely a rubber stamp.

Finally, the Special Committee sought approval from the entire Board other than the controller and an admittedly conflicted director who abstained,[149] issued a proxy statement to stockholders,[150] and received stockholder approval for the increase in shares outstanding necessary to finance the Transactions.[151]

The process of the Special Committee and Director Defendants does not reflect an "intentional dereliction of duty . . . [or] a conscious disregard for one's responsibilities" on the *Disney* bad faith spectrum.[152] A comparison of these allegations to those in *Disney* supports this conclusion.

---

[147] Compl. ¶ 86.

[148] *Id.* ¶ 77.

[149] *Id.* ¶ 88.

[150] *Id.* ¶ 91.

[151] *Id.* ¶ 98.

[152] *Disney III*, 906 A.2d at 66.

In *Disney*, the directors allegedly engaged in "ostrich-like" behavior to avoid assessing the challenged transaction.[153] There, the chairman and CEO of the company hired a "close friend" as president.[154] The board approved the new president's compensation package based only on a "rough summary" of the terms,[155] leaving final negotiations to the two friends.[156] Under those terms, the president received a substantial payout after a non-fault termination, despite his rocky and unsuccessful time at the company.[157] In *Disney*, this Court noted that the board "failed to ask why it had not been informed."[158] Here, the Special Committee questioned Lawal after realizing that it lacked important information.[159] In *Disney*, the board "failed to inquire about the conditions and terms of the agreement."[160] Here, the Special Committee meaningfully negotiated on deal terms.[161] In *Disney*,

---

[153]   *Disney I*, 825 A.2d at 288.

[154]   *Id.* at 279.

[155]   *Id.* at 280.

[156]   *Id.* at 281.

[157]   *Id.* at 289.

[158]   *Id.*

[159]   Special Comm. Opening Br. Ex. A, at 33.

[160]   *Disney I*, 825 A.2d at 289.

[161]   Special Comm. Opening Br. 10.

the board "failed even to attempt to stop or delay . . . [the challenged actions] until more information could be collected."[162] Here, the Special Committee pushed back on the speed of the transaction.[163] Simply put, the behavior of the Special Committee in the instant case is not conscious and intentional disregard on the *Disney* spectrum of bad faith.[164]

---

[162]  *Disney I*, 825 A.2d at 289.

[163]  Special Comm. Opening Br. 55.

[164]  Though I do not find a reason to doubt that the Board members other than Lawal acted honestly and in good faith, for the sake of completeness I pause here to note that Defendants seek safe harbor from claims of a dominated process under an argument that "the interests of the Company and Lawal were **perfectly** aligned in connection with the PIC investment." *Id.* at 46. Unfortunately, the facts as pled by Plaintiff belie their claims. There is reason to believe Lawal may have had incentives that were not fully aligned with those of other Erin stockholders. Though Lawal was a controller of both Allied and Erin, his economic exposure to each was different. Lawal and his family members owned a 97% interest in CAMAC International Limited, which in turn owned 100% of CEHL. Compl. ¶ 19. Lawal's exposure to both Allied and Erin came through CEHL: CEHL owned 100% of Allied, *id.* ¶ 20, and 58.86% of Erin pre-transaction. *Id.* ¶ 19. With this differential exposure, any dollar of a theoretical overpayment from Erin to Allied would have represented a loss at the CEHL level of roughly $0.59 due to the Erin holding but a gain of $1.00 due to the Allied holding, resulting in a net gain to CEHL of roughly $0.41, which in turn would transfer up to Lawal through CAMAC International Limited. Thus, depending on the sources and uses of the funds Lawal may have had incentive to cause Erin to overpay for the assets. Additionally, the subject of Plaintiff's Supplement may indicate another basis for divergent interests. In particular, Plaintiff alleges that Allied, of which Lawal is the controller and in which he has a greater economic stake than in Erin, has only paid "$100 million of the total consideration" of $250 million for its initial purchase of the assets, with "[t]he remainder . . . [being] the subject of recovery by means of a legal action." Supplement Ex. B, at 191. Allied stood to receive a substantial amount of consideration from Erin immediately upon completion of the Transactions, and the fact that a substantial portion of the initial payment for the assets had yet to be completed may have made Lawal more eager than other Erin stockholders not just

53

### 3. The Board's reliance on Canaccord's analysis does not raise a reason to doubt good faith

Plaintiff claims that the Board relied in bad faith on a fairness opinion that allegedly confirmed overpayment for the assets.[165] Plaintiff asserts that Canaccord's November 18, 2013 presentation shows the "value of the Assets . . . at approximately $217.3 million, while the consideration the Company would pay was valued as $416.1 million under a 'market value' analysis and $303.5 million under a 'DCF' analysis."[166]

Plaintiff overstates the information on the slide. Instead of "confirm[ing] that the Company was grossly overpaying for the Assets,"[167] the slide in question shows a range of values for both the assets (between $35.1 million and $707.1 million) and the consideration paid (between $259.7 million and $527.8 million on a discounted cash flow basis and between $416.1 million and $654.6 million on a market value basis). The financial advisor then used its expertise and judgment to determine that

---

for a deal, but for a deal that closed quickly, perhaps with less sensitivity to the sufficiency of the consideration. And if the assets really were worth only $100 million (or some other fraction of the Allied-NEA contract price), then Lawal may have wanted to transfer the assets from a controlled company in which his exposure was higher to a controlled company where he had less economic exposure.

[165]    Pl.'s Opp'n Br. 34.

[166]    *Id.* at 24.

[167]    *Id.* at 34.

in light of those ranges of valuation for the assets and the consideration, the Transactions were fair to the Company.

Plaintiff does not convince me that reliance on the financial advisor's expertise and judgment rises to the level of bad faith. For example, Plaintiff has not adequately alleged that Director Defendants acted with knowledge that the financial advisor's opinion was false. Rule 23.1 requires pleading with particularity, and Plaintiff fails to satisfy this standard.

### 4. The disclosures in the Proxy do not raise a reason to doubt good faith

Plaintiff claims that the Proxy's "stark"[168] lack of disclosure around the concerns of the Special Committee and some of Canaccord's analysis gives a reason to doubt the honesty and good faith of Director Defendants. Plaintiff relies on *In re Tyson Foods*[169] and *Flax v. Pet360*[170] to support the proposition that stark disclosure can create an inference of bad faith and, thus, raise a reason to doubt that the board can consider demand. At the outset, I note that none of the discussions from the

---

[168] *Id.* at 48.

[169] *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563 (Del. Ch. 2007).

[170] *Flax v. Pet360*, C.A. No. 10123-VCL (Del. Ch. Sept. 15, 2014) (TRANSCRIPT).

cases cited by Plaintiff were in the demand futility context.[171]  Further, these cases reflect extreme and intentional efforts to mislead stockholders.

*In re Tyson* found bad faith allegations arising from disclosures in the annual proxy statements only after an "SEC investigation revealed that Tyson's proxy statements were incomplete and misleading between 1997 to 2003, in that they included under 'travel and entertainment' costs expenses that could not reasonably be considered either travel or entertainment."[172]  The SEC also entered an order—to which Tyson consented—stating that "Tyson made misleading disclosure of perquisites and personal benefits provided to Don Tyson in proxy statements filed from 1997 to 2003."[173]  Ruling on a motion to expedite, this Court in *Flax* found bad faith implications from stark disclosures where the entirety of the disclosure "is nothing other than a disclosure of what the final terms are and that the board of directors voted in favor of it.  That's it, period."[174]

---

[171]  *In re Tyson Foods,* 919 A.2d at 597; *Flax*, C.A. No. 10123-VCL, at 24:17-24. Plaintiff also relies on *Haverhill v. Kerley*, C.A. No. 11149-VCL, at 11:7-11 (Del. Ch. Feb. 9, 2016) (TRANSCRIPT), but only counsel for one of the parties mentions bad faith in *Haverhill*, not this Court.

[172]  *In re Tyson*, 919 A.2d at 579.

[173]  *Id.*

[174]  C.A. No. 10123-VCL, at 4:14-16.

Here, Plaintiff claims that "[n]one of the objectionable conduct and concerns of the Special Committee emphasized [in Plaintiff's brief] . . . were disclosed in the Transaction Proxy."[175] Plaintiff also argues that the Proxy did not disclose that (1) "Canaccord's [initial] refusal to provide a fairness opinion . . . arose largely from the value of the asset that the Company would receive . . . being far lower than the consideration it would pay" or (2) "Canaccord's slide presentation for the Transactions comparing the value of the Assets . . . with the value of the consideration that the Company paid for the Assets."[176] But Plaintiff does not convince me that the absence of such disclosures renders the Proxy here comparably stark or misleading to those disclosures in *Tyson* or *Flex*. Even assuming that these additional disclosures would be material to an investor, Plaintiff also does not explain why these omissions would give rise to bad faith claims against Director Defendants. Thus, Plaintiff's disclosure allegations fail to raise a reason to doubt that Director Defendants acted in good faith.

---

[175]    Compl. ¶ 71.

[176]    Pl.'s Opp'n Br. 74.

57

### 5. The Supplement does not raise a reason to doubt good faith

Recently revealed facts suggest that Allied only paid $100 million in its initial acquisition of the Oil Field Leases.[177] As to the question of demand futility,[178] namely, whether this Court will leave the decision of whether to pursue this litigation with the Erin Board, Plaintiff argues that one of two "inferences must be true: either (1) the Special Committee *did not know* that Lawal/Allied only paid $100 million of the $250 million agreed price for the Assets, or (2) the Special Committee *did know* that Lawal/Allied did not actually 'pay $250 million in cash' for the Assets and intentionally misled stockholders in the Proxy."[179] I agree with Plaintiff that these are the only two possibilities. I further note that, if the second scenario is true, Plaintiff likely would have very serious claims of bad faith against Director Defendants.

The first situation, however, would only state a duty of care claim, for which Director Defendants are exculpated under Erin's exculpatory charter provision,[180] allowing the Board to retain control over this litigation. Plaintiff offers no

---

[177] Supplement ¶ 3.

[178] Because I find demand is not excused, I need not consider the other implications of Plaintiff's rather startling Supplement; the decision to pursue the claims remains with the Board.

[179] Pl.'s Opp'n Br. to Mot. to Dismiss Supplement 21 (citing Supplement ¶¶8-10).

[180] Special Comm. Opening Br. Ex. F, at Art. VIII.

particularized facts whatsoever to determine under which of these two scenarios this case falls.[181] Even taking all inferences in favor of Plaintiff, I do not believe I am allowed to imply a bad faith violation instead of a care violation when Plaintiff has given me no way to choose between the two. As such, I am forced to conclude that Plaintiff has failed to plead non-exculpated claims against a majority of the Erin Board.

### 6. The Transactions do not constitute waste

Plaintiff contends that the Transactions constitute waste.[182] Other than the issues raised in the Supplement, which I analyzed *infra*, Plaintiff does not raise with particularity any reason to believe that the Board "with full knowledge . . . gift[ed] to the Company's controller" a great deal of money.[183] Thus, Plaintiff fails to plead waste.

### 7. Demand is not futile because Plaintiff fails to plead non-exculpated claims against a majority of the Erin Board

While the Complaint states a claim of bad faith against Lawal, Plaintiff has failed to plead facts sufficient to raise a reason to doubt that Director Defendants

---

[181] Plaintiff examined Erin's books and records pursuant to a Section 220 demand, which revealed other negative facts about the transaction process, but Plaintiff has not pointed the Court to any information that would allow the Court to infer knowledge to Director Defendants.

[182] Pl.'s Opp'n Br. 49.

[183] *Id.* at 50.

acted honestly and in good faith. Without any substantial likelihood of liability, the Board retains the right to manage this litigation under the second prong of *Aronson*. Plaintiff failed to bring a demand on the Board. Thus, I dismiss the derivative claims for failure to make demand.[184]

## C. Plaintiff's Disclosure Claims Fail

In considering a motion to dismiss under Rule 12(b)(6), "(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; [and] (iii) the Court must draw all reasonable inferences in favor of the non-moving party."[185] While I must draw all reasonable inferences in Plaintiff's favor, I need not "accept as true conclusory allegations 'without specific supporting factual allegations.'"[186] "[D]ismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[187]

Plaintiff asserts a direct claim against Director Defendants for breach of the duty of disclosure relating to alleged material omissions and misleading statements

---

[184] Because I dismiss the derivative claims for failure to make demand under Rule 23.1, I do not consider the related arguments under Rule 12(b)(6).

[185] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[186] *Id.* (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65-66 (Del. 1995)).

[187] *Id.* (quoting *Savor*, 812 A.2d at 896-97).

in the Proxy.[188]  Plaintiff alleges that stockholders were "induced to approve the Transactions without having sufficient knowledge to make an informed vote."[189] "Plaintiff . . . seeks rescissory damages."[190]

Plaintiff correctly cites *In re J.P. Morgan* for the proposition that where "a duty of disclosure violation impaired the stockholders' right to cast an informed vote, that claim is direct."[191]  Plaintiff, however, fails to complete the analysis under that case.  There, the Delaware Supreme Court held that "compensatory damages . . . from the [proxy] disclosure violation" are disallowed when those damages would be "identical to the damages that would flow to [the company] as a consequence of . . . [the] underlying derivative [ ] claim."[192]

Plaintiff contends that, because he has requested rescissory instead of compensatory damages, *J.P. Morgan* does not apply.[193]  Plaintiff misses the point.

---

[188]  Compl. ¶¶ 129-32.  Plaintiff also initially argued that Lawal breached his fiduciary duties by aiding and abetting the disclosure violations.  *Id.* at ¶¶ 134-39.  Plaintiff has since abandoned the aiding and abetting claims against Lawal and CEHL, arguing that it is encompassed in the fiduciary duty violation.  Oral Arg. Tr. 75-76.

[189]  Compl. ¶¶ 132, 139.

[190]  Pl.'s Opp'n Br. 81 n.34.

[191]  *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 772 (Del. 2006) ("*J.P. Morgan II*").

[192]  *Id.* at 772.

[193]  Pl.'s Opp'n Br. 81 n.34.

The key question is whether the damages, rescissory or otherwise, "would flow only to [the Company, and] not to the shareholder class."[194] Plaintiff offers no explanation as to why rescissory damages ought to be owed to the stockholder and not Erin. And I see no reason why rescissory damages should not accrue to the Company. As Plaintiff points out, "[r]escissory damages are 'the monetary equivalent of rescission' and may be awarded where 'the equitable remedy of rescission is impractical.'"[195] In other words, rescissory damages stand in where rescission is not available. Were rescission reasonable and appropriate, I would undo the Transactions and put the Company back together into its previous state. That remedy seems quite obviously to belong to the Company. Rescissory damages, then, would flow to the same party, namely the Company.

As such, I find that the *J.P. Morgan* decision disallows Plaintiff's direct claims. This prevents the perverse result that Defendants must pay identical rescissory damages to both Erin and the stockholders for the same underlying behavior.[196]

For the reasons stated above, I dismiss Plaintiff's direct claims.

---

[194] *J.P. Morgan II.*, 906 A.2d at 772.

[195] Pl.'s Opp'n Br. 80 (quoting *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 38 (Del. Ch. 2014)).

[196] *J.P. Morgan II.*, 906 A.2d at 773 (citing *J.P. Morgan I*, 906 A.2d at 825-826).

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED as to all claims.

IT IS SO ORDERED.